WO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

COLWELL CONSULTING LLC,

      Plaintiff,

v.

MICHAEL PAPAGEORGE AND
PPG CONSULTING LLC,

      Defendants.

Court No. 2:24-cv-01824-JCG

## OPINION AND ORDER

Before the Court is the Application for Temporary Restraining Order of

Colwell Consulting, LLC ("Colwell" or "Plaintiff") ("Plaintiff's Motion" or "Pl.'s

Mot.") (Doc. 6).  Plaintiff also filed Plaintiff's Supplement to Application for

Temporary Restraining Order (Doc. 10).  Michael Papageorge ("Papageorge") and

PPG Consulting LLC ("PPG") (collectively, "Defendants") filed Defendants'

Response to Application for Temporary Restraining Order ("Defs.' Resp.") (Doc.

11).  The Court held oral argument on Plaintiff's Motion on August 7, 2024.  For

the following reasons, Plaintiff's Motion is granted in part and denied in part.

## BACKGROUND

Colwell Consulting LLC is an Arizona limited liability company that

provides thermal sciences services, such as determining the causes, origins, and

propagation of fires.  Compl. at 2 (Doc. 1); Pl.'s Mot. at 1.  Michael Papageorge

was hired by Colwell in 2016 as an engineer.  Compl. at 3; Pl.'s Mot. at 1; Defs.'

Resp. at 2.  During his employment, Papageorge investigated fires and explosions

in multiple states, which included visiting sites, planning and conducting

experiments, reviewing technical literature, and preparing expert reports and

opinions.  Compl. at 6–7; Pl.'s Mot. at 2; Defs.' Resp. at 2–3.

At the beginning of his employment, Papageorge entered into three

restrictive covenants.  Compl. at 3; Pl.'s Mot. at 2; Defs.' Resp. at 3.  The non-

competition provision read:

> Non-Competition.  While employed by Employer and for a one-year
> period after termination of that employment for any reason, Employee
> agrees not to engage in business operations, on his/her own behalf or
> on behalf of any other person, partnership, corporation, firm or entity
> of any kind whatsoever, become employed or otherwise engaged by,
> receive profits from, receive compensation or other remuneration from,
> engage in, establish, become associated or connected with, own,
> manage, operate, join, control, or participate in the ownership,
> management, operation, or control of, advise, consult with, or otherwise
> give assistance to any business that is in competition with Employer
> within the United States.  However, it is not a breach of this covenant
> if Employee is not involved in a branch of the business that competes
> with Employer or if Employee works in a capacity that does not engage
> in or relate to any activity that competes with Employer.
>
> To be in "competition with Employer" means to engage, conduct, or
> transact in any business or activity that is identical or substantially
> similar to that conducted by Employer.  Employee specifically

acknowledges and agrees that Exponent is directly in competition with Employer.

Pl.'s Mot. at Ex. 4 ("Covenants") at 1.

The non-solicitation provision reads:

<u>Non-Solicitation.</u>   While employed by Employer and for a one-year period after termination of that employment for any reason, Employee has not and will not (either as an individual for Employee's own enterprise, or as a partner, joint venturer, officer, employee, agent, salesman, consultant, or 5% or more shareholder of any entity or third party):

1. hire, accept, service, or solicit for employment, directly or indirectly, any personnel of Employer in any position for a company, enterprise, or business that offers similar services to those of Employer (which shall be deemed to include, without limitation, any existing or prospective employee, consultant, or independent contractor of Employer or any person who has been such an employee, consultant, or independent contractor within two years prior thereto), with whom Employee had contact during employment with Employer;

2. attempt, directly or indirectly, to induce any such personnel of Employer with whom Employee had contact during employment with Employer to leave the employ of, or discontinue such person's consultant, contractor, or other business association with Employer to join a company or enterprise that offers similar services as Employer;

3. accept, service, or solicit, directly or indirectly, any vendor, customer, merchant, account, or prospective vendor of Employer with whom Employee had contact during employment with Employer;

4. solicit, either directly or indirectly, Employer's lead sources including those prospective lead sources with whom Employee had contact during employment with Employer.

<u>Id.</u>

The confidentiality provision reads:

Confidentiality. Employee acknowledges that, in the course and scope of his/her employment with Employer, s/he will have access to Employer's proprietary information. For purposes of this agreement, Employee agrees that "Proprietary Information" means all information that can be protected as a trade secret under the law(s) of the state(s) in which Employee performs work for Employer, including, but not limited to, work papers, work products, client files, computer programs, databases, improvements, discoveries, inventions, techniques, strategies, financial statements, budgets, projections, billing practices, client lists, supplier lists, vendor lists, business records, marketing records, plans and data. Employer's Proprietary Information was or will be prepared and developed by Employer at great expense and over lengthy periods of time, is secret, proprietary and confidential, is unique and constitute[s] the exclusive property and secrets of Employer, and any use or disclosure of such Proprietary Information, except in accordance with and under the provisions of this or any other written agreement between Employer and Employee, would be wrongful and would cause irreparable injury to Employer. In addition, Employee understands and acknowledges that, by virtue of Employee's employment by Employer, Employee will have access to information which is confidential and proprietary to Employer's customers, clients, suppliers, and other third parties and that such information should be subject to the same restrictions against disclosure by Employee as Employer's Proprietary Information. Accordingly, Employee avows and agrees that Employee has and will comply at all times with the following restrictions regarding Proprietary Information:

1.      Employee will not, without the express written consent of Employer, publish, disclose, or divulge to any person, partnership, corporation, firm or entity of any kind whatsoever any Proprietary Information, including without limitation in scientific or engineering journals, except in accordance with and under the provisions of the agreement or other written agreements between Employer and Employee.

2.      Employee will not use, directly or indirectly, for Employee's own benefit or for the benefit of any other person, partnership, corporation, firm or entity of any kind whatsoever any Proprietary Information except in accordance with and under the

provisions of this agreement or other written agreements between Employer and Employee.

3.   Employee will treat confidentially all documents involving Proprietary Information that are delivered or made available to Employee as a necessary part of Employee's responsibilities as an employee of Employer, whether or not they are identified or marked by Employer as proprietary or confidential documents, and further, Employee will not reproduce or use such documents without appropriate authority.

4.   Employee will not advise others of Proprietary Information known or used by Employer or other affiliated or associated with Employer.

5.   Employee will abide by the same restrictions set forth in subparagraphs (1) through (4), inclusive, as to any information which is proprietary and confidential to third persons and which is divulged to Employee by virtue of Employee's employment with Employer.

6.   Employee will not use any Proprietary Information when making personal investment decisions.

Id. at 2.

Papageorge expressed his intention to resign from his position at Colwell on June 7, 2024.  Compl. at 7; Pl.'s Mot. at 4; Defs.' Resp. at 3–4.  After speaking with Jeffery Colwell, the Principal Engineer and sole member of Colwell, Papageorge decided to not resign at that time.  Compl. at 7; Pl.'s Mot. at 4; Defs.' Resp. at 4.  Ten days later, on June 17, 2024, Papageorge reversed his decision and submitted his resignation.  Compl. at 7; Pl.'s Mot. at 4; Defs.' Resp. at 4.  At the time of his resignation, Papageorge notified Colwell that he was planning to work for PPG Consulting, LLC, a company that he founded.  Pl.'s Mot. at 4; Defs.'

Resp. at 5.  At the time of his resignation, Colwell reminded Papageorge of the

restrictive covenants.  Compl. at 7; Pl.'s Mot. at 4–5.

 Following Papageorge's separation, Colwell retained a forensic IT company

to inspect Papageorge's electronic equipment.  Compl. at 7; Pl.'s Mot. at 5.  The

forensic analysis revealed that Papageorge downloaded many documents from

Colwell's system on or about June 7 and 17, 2024.  Compl. at 8; Pl.'s Mot. at 5–6.

The files were copied to drives that Colwell does not have in its possession.  Pl.'s

Mot. at 6.  Defendants retained their own forensic IT expert, who concluded that

the evidence did not show that Papageorge took non-personal documents from

Colwell when he left the company.  Defs.' Resp. at 6–7.

## JURISDICTION AND LEGAL STANDARD

 The Court has jurisdiction over Plaintiff's federal Defend Trade Secrets Act,

18 U.S.C. § 1831 et seq., claims pursuant to 28 U.S.C. § 1331, which grants the

district courts original jurisdiction over "all civil actions arising under the

Constitution, laws, or treaties of the United States."  The Court has supplemental

jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

 Federal Rule of Civil Procedure 65 allows the court to grant injunctive relief

to preserve the status quo or to avoid irreparable injury that might be suffered

during the pendency of an action.  Fed. R. Civ. P. 65.  The Court's analysis for a

temporary restraining order is "substantially identical" to that for a preliminary

injunction.  Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  A party seeking injunctive relief under Federal Rule of Civil Procedure 65 must establish that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm if the relief is not granted, (3) the balance of harms favors the requesting party, and (4) that the requested injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir. 2012).

## DISCUSSION

Plaintiff moves for a temporary restraining order prohibiting Defendants from "competing with, soliciting the clients of, and using confidential and trade secret information they misappropriated from Colwell in violation of Papageorge's restrictive covenants and federal and state law."  Pl.'s Mot. at 1.  Defendants oppose the motion and assert that they have not engaged in any conduct in breach of agreements or law.  See Defs.' Resp.

### I.    Likelihood of Success on the Merits

Plaintiff asserts claims of: (1) breach of restrictive covenants; (2) misappropriation of trade secrets; (3) misappropriation of confidential information; (4) tortious interference with contract; (5) unjust enrichment; and

(6) unfair competition.  Compl.  For the reasons discussed below, the Court finds

that Plaintiff has demonstrated a likelihood of success on at least some of its

claims.

## A.    Breach of Restrictive Covenants

Under Arizona law, a post-employment restrictive covenant must:

(1) impose reasonable time and geographic limitations; (2) not exceed what is

reasonably necessary to protect the employer's legitimate business interests;

(3) not unreasonably restrict the employee's rights; and (4) not offend public

policy.  See Bed Mart, Inc. v. Kelley, 45 P.3d 1219, 1221 (Ariz. Ct. App. 2002).

Reasonableness is a question of law based on a fact-intensive inquiry.  Valley Med.

Specialists v. Farber, 982 P.2d 1277, 1280–81 (Ariz. 1999).

Arizona's blue-pencil rule allows courts to strike grammatically severable,

unreasonable provisions from restrictive covenants to preserve valid portions of the

agreement.  Id. at 1286.  In applying the rule, courts should only strike those

unlawful parts of the contract that are clearly severable.  Olliver/Pilcher Ins., Inc.

v. Daniels, 715 P.2d 1218, 1221 (Ariz. 1986).  The rule does not empower courts

to add or redraft provisions to make them enforceable.  Valley Med. Specialists,

982 P.2d at 1286.  Any changes that the court makes should reflect the parties'

original meeting of the minds and should be consistent with the underlying

contract.  See Compas Bank v. Hartley, 430 F. Supp. 2d 973, 981 (D. Ariz. 2006).

### 1.    Non-Compete Provision

The non-compete provision restricts Papageorge's ability to:

> for a one-year period after termination of [his] employment for any
> reason, . . . engage in business operations, on his/her own behalf or on
> behalf of any other person, partnership, corporation, firm or entity of
> any kind whatsoever, become employed or otherwise engaged by,
> receive profits from, receive compensation or other remuneration from,
> engage in, establish, become associated or connected with, own,
> manage, operate, join, control, or participate in the ownership,
> management, operation, or control of, advise, consult with, or otherwise
> give assistance to any business that is in competition with Employer
> within the United States.

Covenants at 1.  Plaintiff contends that the terms of the non-compete provision are

reasonable.  Pl.'s Mot. at 8–10.  Defendants argue that the provision is overbroad

and exceeds the scope of what is necessary to protect Plaintiff's legitimate

interests.  Defs.' Resp. at 8–13.

The non-compete provision has a nationwide scope, prohibiting Defendants

from engaging in business that is in competition with Plaintiff "within the United

States."  Covenants at 1.  Plaintiff argues that this scope is reasonable because

Papageorge "investigated fires and explosions and worked on corresponding cases

in which Colwell was retained as an expert throughout the United States and

abroad."  Pl.'s Mot. at 9.  Plaintiff identifies 39 states in which it alleges that

Papageorge worked on cases during his employment.  Pl.'s Mot. at 9; Pl.'s Mot. at

Ex. 1 ("Colwell Decl.") at 2, Att. A & B.  Defendants do not directly contest that

Papageorge's work involved each of the 39 listed states, but highlights that Papageorge did not work with clients in 11 states, that some of the listed states only had one listed client, and that other listed states identified no actual clients. Defs.' Resp. at 9–10; see also Colwell Decl. at Att. A.

The court concludes that the geographic scope of the non-compete provision as drafted is overbroad. In covering the entirety of the United States, the restriction encompasses areas in which Papageorge had minimal contact or no contact at all during his employment. Because the provision is not limited to only Plaintiff's clients, it would amount to a total bar on Papageorge's ability to practice his chosen profession anywhere in the country. See Olliver/Pilcher Ins., 715 P.2d at 1220. Such a broad scope does not protect a legitimate interest for Plaintiff other than avoiding competition. Valley Med. Specialists, 982 P.2d at 1284. It is also not possible for the Court to salvage the provision by striking the geographic scope. The language is not clearly severable and, even if it was, striking "within the United States" would not meaningfully alter the overbroad scope. Olliver/Pilcher Ins., 715 P.2d at 1221. Because the record before the court does not support the reasonableness of the non-compete provision, Plaintiff has not carried its burden of demonstrating a likelihood of success on the merits of its claim for breach of the non-compete provision.

## 2.      Non-Solicitation Provision

The non-solicitation provision prohibits Papageorge from accepting, servicing, or soliciting any of Plaintiff's clients for a period of one year after the termination of Papageorge's employment.  Covenants at 1.  Plaintiff argues that the non-solicitation provision is reasonable because it is limited to only those clients "with whom [Papageorge] had contact during [his] employment with [Colwell]." Pl.'s Mot. at 10; Covenants at 1.  Defendants contend that this restriction is unreasonable because it encompasses clients who no longer wish to work with Plaintiff and restricts the rights of customers who are not party to the covenant to hire businesses of their choice.  Defs.' Resp. at 13–14.

The non-solicitation provision is not marred by the overbroad geographic scope of the non-compete provision, but the Court must consider whether the one-year duration is reasonable.  "When the restraint is for the purpose of protecting customer relationships, its duration is reasonable only if it is no longer than necessary for the employer to put a new [employee] on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers."  Amex Distrib. Co. v. Mascari, 724 P.2d 596, 604 (Ariz. Ct. App. 1986) (internal citation omitted).  Papageorge was hired as an engineer in 2016 after completing his graduate education.  Colwell Decl. at 1.  Prior to joining Colwell, Papageorge "had not specifically conducted fire and explosion scene

examinations or evaluated expert reports."  Defs.' Resp. at 23–27 ("Papageorge

Decl.") at 3 (emphasis in original).  Papageorge acknowledges that he attended a

one-week course titled "Fire Investigation 1A: Fire Origin and Cause

Determination" shortly after he started and shadowed another employee in

approximately three inspections.  Id. at 2.  A period of time elapsed between when

Papageorge was hired and when he began to perform solo inspections.  See id.  He

was promoted at least twice during his tenure.  Colwell Decl. at 2.  It is not clear

from the record when Papageorge began to act as an expert witness.  Though

Papageorge might have possessed significant scientific knowledge at the time of

his hiring, it is apparent that his responsibilities and knowledge base increased over

the course of his employment.  Papageorge admits that after starting his

employment, he "began reading and further educating [himself] through personally

identified online reading, reading of textbooks, and personal communications with

outside experts on all manners regarding fire and explosion related investigation

and testing."  Papageorge Decl. at 2.  Recognizing that Papageorge developed and

improved his skills, knowledge, and client relationships significantly from the

beginning to the end of his employment, the Court concludes that the one-year

duration of the non-solicitation provision is reasonable because it would take more

than one year to hire and train a new employee to become an expert witness.

Arizona courts have recognized that limiting the scope of restrictive covenants to only those clients that the employee had relationships with during the period of employment is not unreasonable or oppressive.  See Olliver/Pilcher Ins., 715 P.2d at 1219–20; see also Amex Distrib. Co., 724 P.2d at 603–04.  The non-solicitation provision does not prevent Defendants from advertising or accepting clients that Papageorge did not work with while employed by Colwell.  The Court concludes, based on the record before it, that the non-solicitation provision is reasonable.

In support of its contention that Papageorge breached the non-solicitation provision, Plaintiff argues that Papageorge set up PPG before resigning from his position with Colwell, that he presented himself through PPG's website as providing the same type of services as he performed at Colwell, and that he is performing work for some of Colwell's clients.  Pl.'s Mot. at 11.  The Court is not persuaded that the simple acts of establishing a new company or listing qualifications and services on a public website that any potential client might view constitute "accepting, servicing, or soliciting" work under the non-solicitation provision.

Following Papageorge's resignation, Colwell was contacted by clients requesting that their files be forwarded to PPG.  Colwell Decl. at 3.  Defendants contend that these files were sent to PPG without objection.  Defs.' Resp. at 13.

Plaintiff also suggests that it received email messages to Papageorge's former

company email address from Colwell's clients discussing work that Defendants

were or would be performing on their behalf.  Pl.'s Mot. at 11.  Plaintiff has not

provided copies of these emails or discussed their specific contents.  There is no

indication, beyond speculation, that Papageorge actively solicited Colwell's

clients.  It is possible that those clients learned of Papageorge and PPG through the

company's website.  The non-solicitation provision, however, extends beyond just

acts of solicitation and includes accepting work from Colwell's clients.  Courts

have expressed concern, at least in the context of certain industries, toward

covenants that operate to restrict a customer's right to choose which company to

hire.  See Compass Bank, 430 F. Supp. 2d at 983–84; see also Merrill Lynch,

Pierce, Fenner & Smith, Inc. v. McClafferty, 287 F. Supp. 2d 1244, 1250 (D. Haw.

2003).  The Court is not concerned in this case that the one-year restriction

imposed by the non-solicitation provision creates a sufficient obstacle for

customers to find a competent engineer capable of performing the type of work

offered by Plaintiff and Defendants.  The Court is also not convinced, and is aware

of no legal authority holding, that Plaintiff's decision to forward client files to

Defendants waived the non-solicitation restrictions.  The covenant imposes a

burden on Papageorge to not accept Colwell's clients.  The Court concludes that

Plaintiff has demonstrated a likelihood of success on its breach of the non-

solicitation provision claim.

### 3.    Confidentiality Provision

The confidentiality provision prohibits Papageorge from using Colwell's

proprietary information for his own benefit.  Covenants at 2.  The provision defines

propriety information to include:

> all information that can be protected as a trade secret under the law(s)
> of the state(s) in which Employee performs work for Employer,
> including, but not limited to, work papers, work products, client files,
> computer programs, databases, improvements, discoveries, inventions,
> techniques, strategies, financial statements, budgets, projections,
> billing practices, client lists, supplier lists, vendor lists, business
> records, marketing records, plans and data.

Id.  Defendants do not challenge the enforceability of the confidentiality provision

and the Court finds it reasonable.  Defs.' Resp. at 14–15.

Plaintiff contends that Papageorge breached the confidentiality provision by

downloading and taking a "significant number" of documents from Colwell's

computer system prior to and on the date of his resignation.  Pl.'s Mot. at 11.  In

support of its position, Plaintiff has provided the declaration of its digital forensics

expert, Andreas Mueller.  Pl.'s Mot. at Ex. 9 ("Mueller's Declaration" or

"Mueller's Decl.").  Mueller identified dozens of files that were copied from a

laptop and external hard drives used by Papageorge during his employment.

Mueller Decl. at 2–9, Ex. 2.  He concluded that six USB drives were connected to

Papageorge's laptop on May 10, 2024 at times corresponding to the date and time stamps for four files that were determined to be inaccessible.  Id. at 7–9.  Mueller also concluded that Colwell's drives were "extensively accessed" on the morning of June 17, 2024, the date that Papageorge resigned.  Id. at 9.

Defendants claim that Mueller's declaration does not prove that Papageorge took and subsequently used confidential information.  Defs.' Resp. at 15. Defendants offer their own expert, Michele Bush, who opined that the evidence presented by Mueller was insufficient to conclude that data was copied from Papageorge's company computer to a personal device.  Defs.' Resp. at 31–35 ("Bush Declaration" or "Bush Decl.").  Bush specifically contends that Mueller's analysis did not account for the possibility that files were moved, renamed, or deleted or that the device was modified by Colwell's IT personnel after Papageorge's resignation.  Bush Decl. at 3.  Defendants also contend that Papageorge informed Colwell twice that he had taken only personal files and left the remaining files on hard drives placed on his desk.  Defs.' Resp. at 15.

The Court finds the suggestion that the files accessed by Papageorge were solely personal documents to be unconvincing.  Papageorge first expressed his intention to resign on June 7 and ended his employment on June 17.  Though at least one file accessed on these dates had a name suggesting that it was a personal document, "Papageorge CV 04-2024.DOCX," many of the others appear to be

related to work performed for Colwell's clients.  See Mueller Dec. at Ex. 2.

Colwell contends that the files allegedly taken included a folder titled "Historical

Cases" that contained "information, data, calculations, formulas, literature reviews,

work product, expert reports, and presentations for Colwell's most significant

projects since its inception, which took a significant amount of time and money to

create and compile," a folder titled "Billing" that contained "highly confidential

client information, including work that had been done on specific matters, billing

information, and client contact information," and detailed educational information.

Colwell Decl. at 3–4.  Based on the record before it, the Court can discern no other

logical reason for these business files to have been accessed and transferred on or

around the time of Papageorge's resignation other than for Papageorge's use in a

new competing business.  The Court concludes that Plaintiff has demonstrated a

likelihood of success on the merits for its breach of the confidentiality provision

claim.

### B.    Misappropriation of Trade Secrets

Plaintiff alleges that Defendants have violated the Defend Trade Secrets Act

("DTSA"), 18 U.S.C. § 1836 et seq., and the Arizona Uniform Trade Secrets Act

("AUTSA"), Ariz. Rev. Stat. Ann. § 44-401 et seq.  Compl. at 14–19.  The analysis

for misappropriation of trade secrets is substantially similar under both federal and

state law.  See InteliClear, LLC v. ETC Global Holding, Inc., 978 F.3d 653, 657–

58 (9th Cir. 2020); Gordon Grado M.D., Inc. v. Phoenix Cancer & Blood Disorder

Treatment Inst., 603 F. Supp. 3d 799, 809 (D. Ariz. 2022).  To succeed on a

misappropriation of trade secrets claim, a plaintiff must establish that: (1) it

possessed a trade secret; (2) the trade secret was misappropriated by the defendant;

and (3) the misappropriation caused or threatened damages to the plaintiff.

InteliClear, LLC, 978 F.3d at 657–58; Gordon Grado M.D., Inc., 603 F. Supp. 3d

at 809.

>    The DTSA defines "trade secret" as:
>
>    all forms and types of financial, business, scientific, technical,
>    economic, or engineering information, including patterns, plans,
>    compilations, program devices, formulas, designs, prototypes,
>    methods, techniques, processes, procedures, programs, or codes,
>    whether tangible or intangible, and whether or how stored, compiled,
>    or memorialized physically, electronically, graphically,
>    photographically, or in writing if—
>    (A)    the owner thereof has taken reasonable measures to keep such
>           information secret; and
>    (B)    the information derives independent economic value, actual or
>           potential, from not being generally known to, and not being
>           readily ascertainable through proper means by, another person
>           who can obtain economic value from the disclosure or use of the
>           information.

18 U.S.C. § 1839(3).

>    Similarly, the AUTSA defines "trade secret" as:
>
>    information, including a formula, pattern, compilation, program,
>    device, method, technique or process, that both:
>    (a)    Derives independent economic value, actual or potential, from
>           not being generally known to, and not being readily ascertainable

> by proper means by, other persons who can obtain economic
> value from its disclosure or use.
>
> (b)    Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

Ariz. Rev. Stat. Ann. § 44-401(4).

Defendants contend that Plaintiff's misappropriation claims must fail because Plaintiff has not identified specific trade secrets that were misappropriated. Defs.' Resp. at 15–16. In the Complaint, Plaintiff alleges that Papageorge took "confidential and trade secret information," including "expert reports and testing data and information on numerous cases in which Colwell was retained." Compl. at 8. Plaintiff further alleges that specific files taken by Papageorge included "information, data, calculations, formulas, literature reviews, work product, expert reports, and presentations for Colwell's most significant projects since its inception," "highly confidential client information, including work that had been done on specific matters, billing information, and client contact information," and "detailed educational information prepared by Colwell over the course of 14 years." Id. at 8; see also Colwell Decl. at 3–4. Plaintiff has also provided the Mueller Declaration, which lists specific files corresponding to the allegedly taken data. See Mueller Decl. It is not contested that the Plaintiff took steps to protect this information, including requiring Papageorge to sign the restrictive covenants.

The Plaintiff has plausibly pled that it possessed trade secrets and, as discussed above, that those trade secrets were misappropriated.

The final element of a misappropriation of trade secrets claim is that the alleged misappropriation caused or threatened damages to the plaintiff. InteliClear, LLC, 978 F.3d at 657–58; Gordon Grado M.D., Inc., 603 F. Supp. 3d at 809.  Plaintiff contends that it will suffer monetary damages, loss of goodwill, and accruing harm to relationships as a result Defendants' alleged actions, including the misappropriation of proprietary information.  Pl.'s Mot. at 16. Colwell asserts that the trade secrets that were allegedly taken were developed over several years and would take "vast amounts of time and effort to replicate." Colwell Decl. at 3.  Colwell opines that having the trade secrets, including "information, data, calculations, formulas, literature reviews, work product, expert reports, and presentations for Colwell's most significant projects since its inception," gives Colwell a competitive advantage in its market.  Id.  The alleged misappropriation of the trade secrets would grant PPG an unearned advantage in competition against Colwell resulting in lost profits and, potentially, goodwill with clients.  The Court concludes that Plaintiff has demonstrated a likelihood of success on the merits for its misappropriation of trade secrets claims.

### C.    Remaining Claims

Plaintiff has also alleged counts of tortious interference with contract, unjust enrichment, and unfair competition.  Compl.  The Court need not address each of these claims at this stage of litigation.  For the limited purpose of whether to grant a temporary restraining order, it is sufficient for Plaintiff to demonstrate a likelihood of success on the merits for Plaintiff's breach of the non-solicitation covenant, breach of the confidentiality covenant, and misappropriation of trade secrets claims.  See Compass Bank, 430 F. Supp. at 983.

### II.    Irreparable Harm

Plaintiff contends that, in addition to monetary damages, it will suffer injuries not compensable through an award of monetary damages, including the "(i) loss of current and future client relationships; (ii) loss of contracts between Colwell and its clients; (iii) loss of income generated by those accounts; and (iv) decrease in Colwell's industry market share."  Pl.'s Mot. at 16.  Loss of goodwill and potential customers can constitute irreparable harm that cannot be remedied by a monetary award.  Stuhlbarg Int'l Sales Co., 240 F.3d at 840–41; see also Ocean Beauty Seafoods, LLC v. Pac. Sefoods Grp. Acquisition Co., 648 F. App'x 709, 711 (9th Cir. 2016); Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991).  Clients requesting that their files be transferred to Defendants, despite the restrictive covenants and the

misappropriation of trade secrets, likely resulted in the loss of existing business

and the loss of revenue.  It potentially also resulted in an injury to the goodwill that

Plaintiff had developed with certain customers.  Accordingly, Plaintiff has shown

irreparable harm.

### III.   Balance of Hardships

The balance of hardships favors Plaintiff.  Allowing Defendants to continue

to accept and work with Colwell's clients and to benefit from misappropriated

trade secrets will result in continuing injury to Plaintiff's reputation and goodwill.

Requiring Defendants to adhere to the restrictive covenants that Papageorge

entered into at the start of his employment may temporarily delay Papageorge's

ability to grow PPG but will not completely hinder Papageorge's ability to pursue

employment.  Papageorge would be free to accept clients other than those that he

worked with while employed with Colwell.  He could also pursue an alternative

career consistent with his education and experience, such as teaching or as an in-

house engineer.  The Court finds that the balance of hardships favors Plaintiff.

### IV.   Public Policy

"[T]he public interest is served by protecting a company's right to

proprietary information, business operations, and contractual rights."  Compass

Bank, 430 F. Supp. 2d at 983.  Defendants argue that there is also a public interest

in avoiding restraints on the public's ability to choose to do business with a

particular company.  Defs.' Resp. at 21.  The Court is not persuaded by

Defendants' argument.  In the abstract, the interests of an individual to hire a

particular company is not a superior interest to a company's right to protect its

trade secrets and to guard against unfair competition.  In this specific case, the

business that the client would be selecting would have benefited from the unlawful

misappropriation of trade secrets and the breach of contractual restrictions.  The

Court finds that public policy favors granting the temporary restraining order.

### CONCLUSION

Upon consideration of all documents on the record and the Parties' oral

arguments, the Court finds that a partial temporary restraining order is warranted in

this case.  Accordingly, it is hereby

**ORDERED** that Plaintiff's Application for Temporary Restraining Order

(Doc. 6) is granted in part and denied in part; and it is further

**ORDERED** that Defendants are restrained from directly or indirectly

soliciting or accepting work from any client that Papageorge worked with while

employed by Colwell Consulting, LLC, and it is further;

Court No. 2:24-cv-01824                                    Page 24

**ORDERED** that Defendants shall immediately identify and segregate any

and all information taken by Defendants from Colwell Consulting, LLC.

Defendants shall not utilize such information in any matter until directed by the

Court.

IT IS SO ORDERED this 14th day of August, 2024.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves
U.S. District Court Judge*

---

*Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.